Steven **BLAKE,** Plaintiff,

v.

**UNITED AMERICAN INSURANCE CO., et al., Defendants.**

No. C–2–97–791.

United States District Court, S.D. Ohio, Eastern Division.

Dec. 30, 1998.

Susan B. Gellman, Wolman, Genshaft & Gellman, Columbus, OH, for plaintiff.

Jeffrey B. Sams, Luper Sherriff & Neidenthal, Columbus, OH, Alan E. Popkin, James F. Monafo, Husch & Eppenberger, St. Louis, MO, for defendants.

## OPINION & ORDER

MARBLEY, District Judge.

This cause comes before this Court on Defendants' Motion for Summary Judgment. Plaintiff Steven Blake brought this case, claiming he was demoted and fired as an insurance agent at Defendant United American Insurance Company ("United") in retaliation for his repeated whistleblowing activities. Defendants United, Globe Life and Accident Insurance Company, and Torchmark Corporation (collectively "Defendants") claim both actions were motivated by Blake's professional inadequacies, not retaliation. For the following reasons, Defendants' Motion for Summary Judgment is **GRANTED.**

### I. UNDISPUTED FACTS

Blake joined United as a agent in Dayton in November of 1986. He was promoted to Unit Manager in February of 1987. From that point forward, Blake made several reports to the company of conduct by United and other insurance company agents which he felt was unethical or illegal. He was promoted to Branch Manager of the Fort Wayne office in January of 1989, and in June of 1989 was transferred to the same position in Columbus. He wanted the transfer to Ohio to be close to his family. Blake had high production that season, and was selected as a candidate for Rookie Manager of the Year. In 1991, Blake began reporting directly to the Home Office, as opposed to the "Director of Agencies," which is the normal chain of command. Defendants characterize this as a beneficial change for Blake, making his reporting more convenient. Blake admitted in his deposition that this was a positive move, reflecting his good performance. In 1994, production at the Colum-

bus office declined. In June of 1994, a supervisor, Kevin Dunn, met with Blake and told him his production had to improve. When production did not quickly increase, United demoted Blake, and transferred him back to the Dayton branch as a Unit Manager in September of 1994. However, United continued to pay Blake his "Branch Manager renewals," a bonus that Unit Managers typically do not receive at United. In December of 1996, United terminated Blake, ostensibly for an underwriting violation. Blake brought this suit in June of 1997, claiming that his termination violated the Ohio Whistleblower Statute, Ohio Rev.Code § 4113.52.

From 1987 until 1994, Blake made several reports to United regarding what he considered unethical, possibly illegal actions by agents. In his answers to United's interrogatories, Blake has listed thirty-seven different instances of whistleblowing.[1] Blake confirmed in his deposition and at oral argument with this Court that this list is an exhaustive catalog of the violations he reported during his tenure at United. Defendants admit that each of these instances occurred. Each paragraph contains one instance of whistleblowing, and for organizational purposes, each paragraph has been numbered sequentially. These instances are the crux of this lawsuit, as Blake must be able to demonstrate that his termination was in retaliation for at least one of them. Defendants move for summary judgment, contending the Ohio Whistleblower Statute, as a matter of law, does not provide Blake with a cause of action based on the undisputed facts.

## II. STANDARD FOR SUMMARY JUDGMENT

Fed.R.Civ.P. 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1388–89 (6th Cir. 1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (summary judgment appropriate when the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

## III. ANALYSIS
### A. Blake Did Not Follow the Procedures Required by the Whistleblower Statute

The Ohio Whistleblower Statute, Ohio Rev.Code § 4113.52, specifies the proce-

---

1. This list is attached as Exhibit 1 to this    Order and Opinion.

dures an employee must follow to receive protection under the statute:

(A)(1)(a) If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct and if the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. If the employer does not correct the violation or make a reasonable and good faith effort to correct the violation within twenty-four hours after the oral notification or the receipt of the report, whichever is earlier, the employee may file a written report that provides sufficient detail to identify and describe the violation with the prosecuting authority of the county or municipal corporation in which the violation occurred ...

\* \* \* \* \* \*

(A)(3) If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and if the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the

violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation.

If an employee follows the procedures outlined in these provisions, he may receive the protections of the statute, including the right to bring a civil action for reinstatement, back wages, and costs of litigation within one hundred eighty days after the date the retaliatory action was taken. *See* Ohio Rev.Code §§ 4113.52(D) and (E).

■ Defendants argue Blake's failure to communicate *in writing* many of his reports prevents him from making a claim of retaliation based on these instances. Defendants are correct. The Supreme Court of Ohio has consistently held that a plaintiff must strictly follow the procedures outlined in the Whistleblower Statute. In *Contreras v. Ferro Corporation,* 73 Ohio St.3d 244, 652 N.E.2d 940 (1995), the Ohio Supreme Court determined "[a]n employee who fails to follow the specific requirements of the statute is not a protected whistleblower and, accordingly, may not bring a wrongful discharge action pursuant to R.C. 4113.52." *Id.* at 249, 652 N.E.2d 940. The *Contreras* court further stressed that "the *sole acceptable manner* in which [an] employee may 'blow the whistle' to outside authorities" is by filing "a written report that provides sufficient detail to identify and describe the violation." 73 Ohio St.3d at 249, 652 N.E.2d 940 (emphasis added).[2] The Ohio Supreme Court reaffirmed its position in *Kulch v. Structural Fibers,* 78 Ohio St.3d 134, 677 N.E.2d 308 (1997), when it maintained "[t]he statute mandates that the employer be informed of the violation both orally and in writing." *Id.* at 140, 677 N.E.2d 308. The Court found that, although the plaintiff in *Kulch* orally notified his employer of alleged health and safety violations, his failure to notify the employer *in writing* precluded

**2.** While the present case does not involve reports to outside authorities, but rather reporting *within* the company, this quote illus-

trates the vehemence of the Ohio Supreme Court with regard to the importance of fulfilling the statute's writing requirements.

recovery under the Whistleblower Statute. *Id.*

■ Under Ohio jurisprudence, therefore, it is clear that an employee must notify his employer *both* orally and in writing in order to receive the protections of the Whistleblower Statute. The legitimate policy rationale of avoiding abuse by employees who might concoct retaliation claims after a termination underlies the Ohio Supreme Court's exactitude in requiring that employees carefully follow the procedures outlined in the Whistleblower Statute.

In the present case, therefore, Blake cannot submit instances in which he *orally* reported violations as supportive of a retaliation claim under the Whistleblower Statute. This removes from the Court's consideration Blake's interrogatory allegations in the paragraphs numbered 1, 3, 13, 22, 30, 31, 32, 34, and 36.[3]

## B. Former Employees

■ Several of Blake's reports involved actions taken by former employees, often regarding incidents where these people were working for *other insurance companies.* Blake reported to United the insurance-selling activities of Dennis McComb, Charles Hughes, David Anderson, Rick Heller and Kevin Heller, all of whom were *former* employees of United. Blake's reports about these men referred to acts they committed after their employment with United ended, in their capacities as agents for other insurance companies. Such reporting does not fall within the ambit of the Whistleblower Statute. The statute simply does not define reporting the bad acts of *competitors* to one's own company as whistleblowing. Section 4113.52(A)(1)(a) states that the violation the employee reports must be one that the "employer has authority to correct," and section (A)(3) refers to reporting a "viola-

tion by a fellow employee." This language does not encompass the reporting of a rival company's violation. Nor does common sense support Blake's assertion. The argument that an employer would retaliate against an employee who reported illegal activities of market competitors simply defies logic.

Thus, paragraphs 3 through 12, 15 through 21, and 23 through 26, which refer to the allegedly improper acts of McComb, Hughes, Anderson, Heller and Heller, as agents of other insurance companies, cannot support Blake's claim of retaliation by United.

## C. Remoteness

■ The Whistleblower statute allows an employee to bring a civil action "within one hundred eighty days after the date the disciplinary or retaliatory action was taken." Ohio Rev.Code § 4113.52(D). Blake was demoted in September of 1994. He brought this case on June 6, 1997, over two years after the demotion. The Whistleblower statute thus bars any claims Blake might have had based on the 1994 demotion. Blake's case of retaliation, therefore, must be based upon his December, 1996 firing alone. In conducting the remoteness analysis, this Court's may consider only the December, 1996 firing as a possible retaliatory action by United.

■ As a matter of law, incidents of whistleblowing may be too remote from adverse employment action to support the causal connection necessary to establish a claim of retaliation. *See, e.g., Jackson v. Pepsi–Cola,* 783 F.2d 50, 54 (6th Cir.1986) ("time span of over one year . . . militates against a finding of retaliatory discharge"); *Cooper v. City of North Olmsted,* 795 F.2d 1265 (6th Cir.1986) (four month delay between employee's filing OCRC charge and her discharge precludes prima facie case of

---

**3.** Additionally, the reporting incidents described in paragraphs numbered 8, 35 and 37 may involve oral reporting; it is unclear from the language how Blake reported these instances. During oral argument, Blake asserted that he reported these incidents in writing, but has provided this Court no evidence thereof; Defendants claimed they were reported orally. In any event, these instances are mooted by this Court's discussion of remoteness, *infra.*

retaliation); *Brown v. ASD Computing Center*, 519 F.Supp. 1096 (S.D.Ohio 1981) (four month period between announcement of intent to consult EEOC and discharge did not provide inference necessary to establish *prima facie* case of retaliation); *Allen v. Ingersoll–Rand Company*, 1997 WL 579140 (W.D.Ky.1997) (ten year delay between complaint and firing too remote for reasonable jury to conclude there was causal connection); *Griggs v. Coca–Cola Employees' Credit Union*, 909 F.Supp. 1059 (E.D.Tenn.1995) (six weeks lapse of time precluded finding of retaliation); *Wright v. General Motors Corporation*, 1988 WL 156336 (E.D.Mich.1988) (three year delay between EEOC complaint and discharge precluded direct evidence of connection between the two events). The longer the period between the protected act and the date of discharge, the weaker the inference of retaliation.

■ In the present case, many of Blake's reports were made almost a decade before any adverse employment actions was taken. In fact, United *promoted* Blake after he had reported all the incidents listed in paragraphs I through 24. It seems highly unlikely that a company would keep an employee for nine years after a whistleblowing incident, promote him, and *then* fire him in retaliation for the decade-old report. Blake's whistleblowing instances which took place before his final promotion to Columbus Branch Manager in June of 1989, thus, are too remote to support a claim of a retaliation. Blake was not fired until over seven years after these incidents. Moreover, Blake was rewarded, rather than punished after his reporting. No inference of retaliation can be drawn when an employee is promoted after blowing a whistle.

■ Additionally, the reporting listed in paragraphs 27 through 29, which took place in 1991, five years before Blake's firing, are not close enough in time to the termination to support a claim of retaliation. The three remaining whistleblowing incidents—listed in paragraphs 33, 35 and 37—took place two years prior to Blake's termination. There is ample authority compelling the conclusion that two years between whistleblowing and an adverse employment action is too long a time to support a claim of retaliation. As a matter of law, this Court finds that all of Blake's whistleblowing activities—the latest of which occurred two years before his firing—were too remote from his termination to allow a claim of retaliatory discharge in violation of the Ohio Whistleblower statute.

### CONCLUSION

None of Mr. Blake's whistleblowing instances qualify for protection under the Ohio Whistleblower statute: some were not made in writing; some describe incidents of misconduct by employees in outside companies; all are too remote in time from Mr. Blake's termination to support, as a matter of law, a claim of retaliation. For these reasons, United's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED.**

EXHIBIT # 1

ANSWER:

Following are the persons who have unprivileged knowledge:

Chiquita L. Blake (spouse)

6449 Old Ban Lane

Canal Winchester, Ohio 43110

614/837–4935

Mary Bird (mother-in-law)

600 Nordale Avenue

Dayton, Ohio

614/254–9733

Mary Grulkowski, M.D.

348 Granville Street

Gahanna, Ohio

614/478–9400

6. State whether you, or anyone acting on your behalf, has or knows of any statements in any form from any persons concerning or relating to the allegations in your Complaint, whether taken or given in an investigation of

this or any other complaint, charge or claim, or otherwise. If your answer is anything but an unequivocal "no," state:

(a) The name, address and telephone number of each person from whom a statement was obtained;

(b) The date each statement was obtained; and

(c) The form of each statement, including whether it was written, recorded, or oral, and whether it was signed or unsigned.

ANSWER:

Nothing at this time that is not covered in the answers to other questions.

7. Identify all actions which you reasonably believe to be serious violations of industry regulations in state and federal law, including criminal statutes, as described in paragraph 9 of your Complaint, including but not limited to:

(a) the name and address of the agent(s) who allegedly committed the act(s);

(b) the nature and circumstances surrounding each alleged act or violation.

(c) identify each individual to whom you reported each alleged act(s) or violation(s);

(d) the date(s) each alleged act(s) was reported;

(e) the method by which you reported each alleged act(s), in other words, whether it was in writing or oral; and

(f) each act taken by Defendants in response to your alleged reporting of each act or violation.

ANSWER:

1. Before I became a branch manager, in January 1989, I made oral reports of misconduct I observed as a unit manager. I made these reports to Branch Manager Larry Strong until he was replaced as Branch Manager by Ardenne Rohrer, to whom I also made a few such reports. I do not recall the dates; the period is 1987 to 1989.

2. I reported several incidents that occurred when I was branch manager in Fort Wayne, Indiana, in detail in letters to Lendol Diehl and Steve Simmons. I included letters from customers confirming this illegal activity, as well as copies of the applications which I received between January and June of 1989 containing the various violations, signed by the agents themselves. My letter of June 4, 1989 set forth details of illegal activity on the part of Dennis McComb, Charles Hughes, David Anderson, Rick Heller, and Kevin Heller, including specific dates, customers, and violations of state law, including: (1) deliberate misrepresentations to United American policyholders that they (the agents) represented United American; (2) deliberate misrepresentation as to a large increase in a customer's United American policy premium, to induce the customer to change coverage; (3) forging of a customer's signature on a letter to World Life Insurance Company in an attempt to stop the customer from receiving a refund she had requested and to which she was legally entitled; (4) deliberate misrepresentation of benefits of policies offered for sale; and (5) deliberate misrepresentation to a customer that her agent was no longer working for United American, in order to induce the customer to purchase coverage from the agent making the misrepresentation. The follow-up letter, dated June 11, 1989, detailed additional similar conduct.

3. I also reported this activity on a weekly basis, over a period of several months, by telephone to the home office. I made verbal reports to Lendol Diehl, Steve Simmons, and my immediate supervisor, Larry Strong.

4. To the best of my knowledge, despite my repeated requests for corrective action, the company allowed these agents to continue their actions unchecked other than a letter in May 1989 to policyholders who were customers of Dennis McComb and Charles Hughes informing them that

these two agents no longer represented United American. To the contrary, with full knowledge of his illegal activities, the company rehired and promoted Mr. McComb.

5. Around January 1989: Dennis McComb, address unknown, misrepresented to Joseph and Loretta Snyder that unless they purchased his policy they would not be eligible for "catastrophic coverage" through Medicare. I reported this to Lendol Diehl, by letter, June 11, 1989. To the best of my knowledge, no action was taken.

6. In the fall of 1988, Velma L. Gruenewald wrote to United American complaining of high pressure used by David Anderson. United American wrote to Dennis McComb, who was branch manager at that time. Neither McComb nor United American took action against Anderson, to the best of my knowledge. The company was aware of his committing illegal sales practices prior to my reporting his illegal activity to the company in June 1989, by letters, after which they still took no action against agent, to the best of my knowledge. Addresses unknown

7. In the summer of 1988, David Anderson took a "clean sheeting" application on Edith Strickler in which he failed to list health information that would have disqualified her for coverage. Steve Simmons of the home office was aware of this illegal activity. To my knowledge, no action was taken. Addresses unknown.

8. In the summer of 1988, Naomi Orn filed a complaint against David Anderson, alleging illegal high pressure sales tactics and misrepresentation of coverage, with the Better Business Bureau and the Department of Insurance in Indiana. The company sent a letter to Dennis McComb, then branch manager for United American, on September 8, 1988, regarding her complaint. I reported similar illegal activity regarding David Anderson in June 1989. To my knowledge, United American took no action either time. Addresses unknown.

9. In January 1989, Dennis McComb sold Irene Death a life insurance policy through National Western Life and did not list existing life coverage she had through Globe Life, in violation of state law. I wrote to Lendol Diehl about this in June 1989. To my knowledge, no action was taken. Ms. Death's address is 1109 Bollman, Apt. 29, Decatur, Indiana, 46733.

10. In January 1989, I received a letter from a customer, Mary Biberstine, regarding a United American hospital indemnity policy sold to her as nursing home coverage by former United American agent Charles Hughes. I sent that letter to Lendol Diehl in June 1989. To my knowledge, no action was taken.

11. On January 9, 1989, David Anderson sold Globe Life life insurance policies # 000136509 and # 000136508 to Merl and Opal Sponseller. Mr. Anderson was not licensed to sell life insurance by the state. The policies were signed by United American agent Rex Michel, who was not present at the time the application was taken. I reported this to the company by telephone and letter. The policies were allowed to stay in force. To my knowledge, no action was taken against either agent.

12. On January 25, 1989, David Anderson sold Claude and Lucille Magnuson HMXC–C policies that were falsely represented to them as "riders" to their Medicare supplement policies. This was told to me by policyholders. I reported this in writing to Lendol Diehl in June 1989. To my knowledge, no action was taken. The Magnusons' address is 405 S. Martin, Ligioner, Indiana, 46767.

13. Around February 1989, agent Shirley Kiser listed false information on an application she wrote on Theron B. Cusenberry. I received a letter dated March 6, 1989, from United American regarding this application. I spoke to Mr. Cusenberry regarding Ms. Kiser's actions, requested a full refund be sent, and warned Ms. Kiser orally that if it happened again her contract would be terminated. Addresses un-

known. I reported this orally to Larry Strong, who was at that time Director of Agencies, around March or April 1989.

14. On March 6, 1989, David Anderson rebated $86.00 in premiums on Evelyn M. Bodle towards a United American Medicare supplement policy, in violation of state law. I sent a copy of the signed agent receipt and signed new business turn-in sheet to Lendol Diehl in June 1989. To my knowledge, no action was taken. I do not know Mr. Anderson's address. Evelyn Bodle's address is on file with United American.

15. April 10, 1989: Dennis McComb switched Wilma E. Giordanox to a Medicare supplement policy with Pioneer Life with full knowledge that she had existing coverage with United American and without listing the existing coverage on the Pioneer application, in violation of state law. I wrote to Lendol Diehl about this in June 1989. To my knowledge, no action was taken. I do not know Ms. Giordanox's address, but her policy number is United American # 574059178.

16. On April 17, 1989, Dennis McComb switched Lela Huffman to a Medicare supplement policy through Pioneer Life Insurance, and in doing so violated state law by knowingly lying to Ms. Huffman that her United American premiums were going to double and by failing to list her United American coverage, of which he was aware, on the Pioneer application. I wrote to Lendol Diehl about this in June 1989. To my knowledge, no action was taken. Ms. Huffman's address is 811 Avondale Drive, Bluffton, Indiana, 46714.

17. On April 28, 1989, Charles Hughes replaced Kline and Irene Sands's United American policy with a policy from American Integrity that he misrepresented as combined Medicare and nursing home coverage. The Sandses sent a cancellation letter to Pioneer. I reported this to Lendol Diehl by writing in June 1989. To my knowledge, no action was taken. I do not know the Sandses' address. They were United American policyholders # 573008653 and # 573008652.

18. I received a letter dated May 5, 1989 from United American regarding Merl and Opal Sponseller and numerous problems they were having with agents David Anderson and Rick Heller. I investigated and discovered violations including misrepresenting policy coverage, failure to return premiums from cancellations requested on time, selling life insurance while not being licensed by the Indiana Department of Insurance to do so, duplication of coverage, and extreme high-pressure sales practices. After investigation, I recommended to United American to refund premiums paid, although the free-look period was over, because of the outright deception by these agents. I wrote a letter to Steve Simmons regarding this and also informing him that I had sent additional information to Lendol Diehl. I asked that United American pursue revocation of the licenses of these agents. To my knowledge, no action was taken. The Sponsellers' last known address is 158 E. Randolph, Nappanee, Indiana, 46550. Steve Simmons and Lendol Diehl are employees of Globe Life. Other addresses unknown.

19. On May 11, 1989, Dennis McComb sold a Medicare policy to Vada D. Finney through Standard Life and Accident, replacing United American Insurance, but knowingly and intentionally did not list United American as coverage being replaced, in violation of state law. I wrote to Lendol Diehl about this in June 1989. To my knowledge, no action was taken. Ms. Finney's last known address is 903 North Center, Lot 112, Breman, Indiana, 46506. Dennis McComb is a United American employee.

20. On May 22, 1989, Charles Hughes lied to United American policyholders Kenneth and Ruth Smith by telling them that United American had sent him out, led them to believe that United American no longer offered coverage for older people, and sold them Pioneer Life coverage. I forwarded a letter from the Smiths to Lendol Diehl about this in June 1989. To

my knowledge, no action was taken. I do not know the Smiths' address. They were United American policyholders # 574089826.

21. In May 1989, Charles Hughes knowingly gave false information about an increase in United American's premiums to a United American policyholder, Thelma Wolfe, to entice her to switch companies. I wrote to Lendol Diehl about this in June 1989. To my knowledge, no action was taken. I do not know either Mr. Hughes's or Ms. Wolfe's addresses.

22. In June 1989, Shirley Kiser forged a signature on a delivery slip. I verified this with the customer. I reported this to Larry Strong, who would not let me fire Ms. Kiser. To my knowledge, no action was taken.

23. In June 1989, I received notice from United American that Delta Whetstone wanted to cancel her policy. I went to see her and learned that former United American agent Rick Heller had replaced a United American nursing home policy. Rick wrote the application, but it was later signed by his brother, Kevin Heller, who was not present when the application was taken. When Mrs. Whetstone requested a refund from World Life, Rick Heller signed her signature on a letter to World Life in an attempt to stop the cancellation and her refund. I assisted her in a complaint to the Indiana State Department of Insurance. I sent copies of all correspondence to Lendol Diehl in June 1989. To my knowledge, no action was taken. I do not know Rick or Kevin Heller's addresses. They were former United American agents. Mrs. Whetstone's address is R.R. 5, Box 310A, Warsaw, Indiana 46580.

24. In June 1989, a customer, June Allgeir, reported to me that Dennis McComb, when replacing her United American Medicare supplement policy with a Pioneer Life policy, (1) lied to her about a premium increase, (2) failed to list United American as existing coverage (both violations of state law), and (3) knowingly falsely told her that Shirley Kiser was no longer with the company. I wrote to Lendol Diehl about this in June 1989. To my knowledge, no action was taken. I do not know Ms. Allgeir's address, but her policy number is United American # 574060935.

25. I received lapse notices on United American Medicare supplement coverage for Joseph and Clara Labuzienski. I spoke to Mrs. Labuzienski in August 1989 and learned that Dennis McComb had approached the Labuzienskis and told them that the company he represented, Standard Life, had bought out Globe and that he had been sent out to do a "transfer" on their coverage. He asked no health questions. Mr. Labuzienski had been diagnosed with Alzheimer's disease, which would have affected their coverage. Mr. McComb misrepresented that the company he switched than to was associated with United American in order to induce the sale. The Labuzienskis' address is 2206 Prast Blvd., South Bend, Indiana, 46628. I reported this to Lendol Diehl by letter. To my knowledge, no action was taken.

26. On August 15, 1989, I sent a certified letter to Dennis McComb warning him to stop misleading United American policyholders that the companies he represents have bought out or merged with United American in order to induce policyholders to switch to the companies he represents. I sent copies to the Indiana Department of Insurance and to the Globe Life legal department at the home office. To my knowledge, no action was taken.

27. Agent Mike Thompson, "cleansheeted" several applicants; i.e., knowingly failed to list health information on applications that would affect premiums and eligibility. In several cases, premiums had to be increased, and in at least one case a policy had to be voided and all the premiums refunded. Clean-sheeted customers included Germaine Alexander, policy # 2379952; Ralph Kiner, policy # 237995; James W. Young, policies # 002401161 and # 002401158; Vivian Robinson, policy # 002403327; Robert McKenzie, policy # 002401162; and James Bailey, policies # 002387786 and # 002387791. I contact-

ed all the individuals who were to receive refunds and confirmed that Mr. Thompson had been fully aware of the relevant health conditions, which included such conditions as high blood pressure, kidney disease, and diabetes. I also confirmed this with the home office. I reported these incidents in detailed letters, one dated May 30, 1990, and two dated June 8, 1990, with supporting documents and correspondence, to Steve Simmons, Globe Life Branch Manager, with copies to Lendol Diehl and Larry Strong. I also requested, both in writing and verbally, from Mr. Simmons, Mr. Diehl, and Mr. Strong that the company cancel Mr. Thompson's contract and take action to revoke his insurance license. I also wrote a letter dated July 13, 1990 to Linda True at Globe Life's home office regarding Mr. Thompson's misrepresentation of coverage to Mr. Bailey.

28. In 1991, one of my agents alerted me to the existence of the "Delta Brokerage Company," which was comprised of agents in United American's Cincinnati branch office. These agents (I do not know their names) were violating company underwriting procedures and state law by allowing agents who were not authorized by the Department of Insurance to represent Globe Life to sell Globe Life products and failing to have applications signed by the agent who witnessed the signature, as required by the company. I sent a letter by fax regarding these problems, with copies of Delta's documents, to Lendol Diehl on May 1, 1991. To my knowledge, no action was taken.

29. In September 1991, an agent, Ronald Patterson, collected premiums from a customer, Alfred C. Roland, but never turned in either an application or the premiums. Mr. Roland called me on April 16, 1992, to ask why he had never received his policy. I found no record of Mr. Roland. He produced the canceled check, endorsed by Mr. Patterson. I told Mr. Patterson to repay the company and terminated his contract, and resubmitted Mr. Roland's application for him. I reported this in writing, with copies of all documents, to Steve Simmons on April 20, 1992 and June 10, 1992. I am unaware of any further action taken by the company against Mr. Patterson. I do not know Mr. Patterson's address. Mr. Roland's address on the application was Olentangy Inn Corporation, 1299 Olentangy River Road, Columbus, Ohio, 43212.

30. In June 1994, Kevin Dunn sold to Patricia L. Gallagher a Medicare supplement policy which duplicated existing coverage, in violation of state and federal laws regarding prohibiting duplicative Medicare supplement policies. I reported the violation by phone to Steve Simmons and to Mr. Dunn. The company refunded over one year's premium to Ms. Gallagher. To my knowledge, no action was taken against Mr. Dunn; he was promoted twice. I do not know Mr. Dunn's address; I believe he is still an employee of United American.

31. In November 1994, agent Pamela Worley converted coverage on customer Hilda Francis from a United American Medicare supplement plan MC3A to a Plan B, misrepresenting to the customer that the coverage was the same, when in fact the customer would receive less coverage. I reported this orally to Barbara Langdon. To my knowledge, no action was taken. I do not know Ms. Worley's address. Ms. Francis's address is 363 E. Union St., Circleville, Ohio, 43114.

32. In November 1994, a customer, Lucille Adkins, and her husband told me that Ms. Worley had sold her a United American Medicare supplement plan, but that Ms. Worley had not told her that her Medicare Part A deductible was not covered. I reported this orally to Barbara Langdon. To my knowledge, no action was taken. Ms. Adkins's address is 28700 U.S. Highway 23, Circleville, Ohio, 43113.

33. In October 1994, Ms. Worley sold Doris A. Bailey a Medicare supplement policy. Ms. Worley misrepresented to Ms. Bailey that she was also receiving nursing home care coverage; in fact, it was a life insurance policy. I wrote to Rick Gerbofsky, Columbus, Ohio manager, enclosing a

letter from Ms. Bailey. To my knowledge, no action was taken, other than a refund to the customer on the life insurance policy. Ms. Bailey's address is 222 Lear Street, Columbus, Ohio, 43206.

34. In December 1994, agent Robert Ballenger switched Garnette Rice from her United American Medicare supplement policy to another United American policy, misrepresenting that she would be receiving the same benefits, when in fact the life policy was a separate policy and she would receive far less benefits. I reported this orally to Barbara Langdon and assisted Ms. Rice in getting a refund and her old coverage back. No other action taken by the company. I do not know Mr. Ballenger's address. Ms. Rice's address is 700 West 8th Street, Marysville, Ohio, 43040.

35. In November 1994, Mr. Ballenger switched Walter and Ruth Bywater's United American Medicare supplement policies to a different United American supplement policy. Mr.. Ballenger misrepresented to the Bywaters that they would be receiving the same coverage, when in fact they were receiving far less for a lower premium, with the balance of the premium amount used to "include" a separate life insurance policy. I reported this to the company and assisted the Bywaters in getting a refund from United American and their original, better policies reinstated. No other action was taken by the company. Barbara Langdon told me that, per Assistant Vice President Kevin Dunn, if I persisted in reporting and/or correcting this illegal activity, I would have the commissions charged to me and/or be terminated. Kevin Dunn wrote a letter dated March 14, 1995 to Lendol Diehl asking him to credit Mr. Ballenger's account and charge my account for the refund. The Bywaters' address is 20200 State Route 23, Marysville, Ohio 43040.

36. On January 18, 1995, agent Donald A. Vaughn contacted three of agent Chiquita Blake's policyholders, Virginia Brown, Dale Walters, and Christa Walters (now deceased), and (1) misrepresented to them that she was no longer with United American; (2) converted them to lesser coverage, misrepresenting that the supplement coverage was the same, when in fact it was lesser coverage, with the difference in premium being used for a life insurance policy; and (3) misrepresenting to them that the life insurance was part of the supplement benefits, when in fact it was a separate policy. I reported this orally to Barbara Langdon and had the premiums returned and the old coverage reinstated. To my knowledge, no action was taken.

37. On November 3, 1994, Columbus branch manager Rick Grebofsky sold a policy to Lena Siegel, misrepresenting that it was a home health care policy in order to make the sale, failing to leave her an outline of coverage, and never delivering the policy to her. I reported this to Barbara Langdon, who told me that I was to "back off or else [I would] be fired," per Kevin Dunn and unspecified others at the home office. Having taken care of Ms. Siegel's insurance since 1989, I knew that she did not need life insurance, and would not have bought this policy had she known it was life insurance, not home health care. I assisted her in receiving a full refund of all premiums paid.

38. I believe that what I have seen is a small part of what is happening nationally with United American: misleading large numbers of senior citizens into converting existing policies to lesser coverage and using the premium difference for life insurance policies. This is the same practice for which Prudential Insurance was sanctioned. In most cases that I have seen, the customers are told that the life benefit is part of the supplement coverage, which is not available on the government standardized supplement plans, and that the limited living benefit is a home health care policy. Agents receive a high up-front commission for these sales, which prey upon the trust of existing policyholders. I think this is a very widespread practice at United American because I have seen a tremendous increase in the life product sales in just one year in certain branches.

This increase is not attributable to the product or to leads.

8. Please identify all expert witnesses whom you expect to call as witnesses at trial, and for each such expert, please identify the subject matter upon which the expert is expected to testify.

ANSWER:

None at this time.