Saad, J.
I. PROCEDURAL HISTORY[1]
This is the third time we have addressed this case on appeal. Our Court originally adjudicated this alleged Whistleblowers’ Protection Act[2] (WPA) claim in 2011, *319 and our opinion[3] reversed the jury award in Whitman’s favor. We held that the Michigan Supreme Court’s decision in Shallal[4] barred Whitman from claiming protection under the WPA, because he admitted that his motivation for asserting his entitlement to accumulated, unused sick-leave pay under a city ordinance was entirely personal and selfish.[5] We reasoned that, under Shallal, Whitman’s private motivations for asserting defendants’ noncompliance with the city ordinance disqualified him from WPA protections, because he did not act as a whistleblower under the meaning of the WPA. We dismissed his case on this narrow ground, and further held in a footnote that “overwhelming evidence of plaintiffs misconduct in office . . . more than justified the mayor’s decision not to reappoint plaintiff as police chief.”[6]
The Michigan Supreme Court reversed, and disavowed what we thought was the principle articulated in Shallal on the dispositive nature of Whitman’s private motivations.[7] It remanded the case and instructed us to address “all remaining issues on which [we] did not formally rule, including whether the causation element of the [WPA] has been met.”[8]
Because our narrow 2011 ruling regarding Whitman’s private motivation meant that we did not look at *320 the larger — and, to our minds, more important— question of whether Whitman’s conduct objectively promoted the public interest, we addressed and decided this issue on remand in 2014.[9] We held that the purpose of the WPA is to advance the public interest, and thus the statute protects only those plaintiffs whose actions, irrespective of their personal motivations, objectively advance the public interest. And because Whitman’s conduct ran contrary to the public interest, rather than advancing the public interest, we held that Whitman was not protected by the WPA.
We further held, once again, but with fuller explanation, that Whitman’s alleged whistleblowing activity was clearly not the reason the mayor refused to renew his four-year term as chief of police. Instead, the mayor’s refusal to renew Whitman’s four-year political appointment was a direct result of Whitman’s misconduct during his previous term — misconduct that only came to the mayor’s knowledge during his postelection review of his team of political appointees. It was this review, and the information it revealed, that motivated the mayor to refuse to reappoint Whitman to another four-year term as chief of police.
The day after we issued our second decision on appeal, the Michigan Supreme Court issued Wurtz v Beecher Metro Dist,[10] which held that WPA protections do not apply to “job applicants and prospective employees.” [11] Then, on November 19, 2014, the Michigan Supreme Court vacated our 2014 decision and asked us to review our ruling in light of Wurtz.[12] After our review of *321 Wurtz, we conclude that Whitman’s claim must be dismissed under the holding and reasoning in that case.
Therefore, we now hold that Whitman’s claim must be dismissed for any one or combination of the following reasons: (1) Wurtz requires its dismissal, (2) objectively, Whitman’s conduct did not advance the public interest, but instead, it ran contrary to the public interest, and (3) the mayor’s refusal to reappoint Whitman, a political appointee, to another four-year term as police chief was because of Whitman’s misconduct in office, not the whistleblowing activity that allegedly took place long before his four-year term as chief had ended.
II. STANDARD OF REVIEW
A trial court’s ruling on a motion for judgment notwithstanding the verdict (JNOV) is reviewed de novo on appeal. Garg v Macomb Co Community Mental Health Servs, 472 Mich 263, 272; 696 NW2d 646 (2005). “When reviewing the denial of a motion for JNOV, the appellate court views the evidence and all legitimate inferences therefrom in the light most favorable to the nonmoving party to determine if a party was entitled to judgment as a matter of law.” Genna v Jackson, 286 Mich App 413, 417; 781 NW2d 124 (2009).
III. ANALYSIS
A. PLAINTIFF IS NOT ENTITLED TO WPA PROTECTION
1. DEFENDANTS’ALLEGED WPA VIOLATION OCCURRED AFTER THE CONCLUSION OF PLAINTIFF’S TENURE AS POLICE CHIEF
a. LEGAL STANDARDS
MCL 15.362, the provision of the WPA under which plaintiff brought suit, states:
*322 An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee’s compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.
In Wurtz, the Michigan Supreme Court clarified that these protections do not apply to job applicants and prospective employees,[13] because a job applicant or prospective employee cannot be “discharged, threatened, or otherwise discriminated against regarding his or her compensation, terms, conditions, location, or privileges of employment”[14] — only a current employee can suffer such mistreatment.[15] In other words, the WPA applies to an employer’s improper actions regarding an individual’s protected conduct only when the conduct occurs during the course of his employment.[16]
Accordingly, when it adjudicates a claim under the WPA, Wurtz emphasizes the plaintiffs employment status at the time the alleged WPA violation occurred.[17] *323 If a defendant committed the alleged WPA violation during the course of a plaintiff’s employment, the plaintiff’s claim may proceed. If the defendant committed the alleged WPA violation when the plaintiff was not employed by the defendant, or when the plaintiff was a job applicant or prospective employee, the plaintiffs claim must fail.[18] Under Wurtz, this classification — employed versus not employed (as a job applicant, prospective employee, or former employee) — is the only classification a court may use to assess whether the WPA provides protection to a plaintiff.[19] For purposes of this determination, it is inconsequential whether the plaintiff was an at-will employee, contract employee, or just-cause employee — the plaintiff is protected by the WPA only if the alleged WPA violation occurred during the course of his employment.[20]
The Michigan Supreme Court applied these principles to Wurtz, a contract employee who worked for a local water and sewage district under a fixed term.[21] Wurtz wished to continue in his position after termination of his contract term, but the district declined to *324 renew his contract.[22] Wurtz then sued the district and alleged that it violated the WPA when it refused to renew his contract, because it supposedly did so in retaliation for actions he took during his employment.[23] The Michigan Supreme Court rejected Wurtz’s claim because the WPA violation he claimed the district committed — its decision to not renew his contract— occurred after the conclusion of his contract term, when Wurtz was a job applicant or prospective employee.[24] Stated another way, because the WPA violation alleged by Wurtz did not take place during the course of his employment, Wurtz had no claim against the district under the WPA.[25]
In sum, Wurtz holds that when a plaintiff alleges that a defendant violated the WPA, a court must assess the claim by ascertaining whether the alleged WPA violation occurred during the course of the plaintiffs employment with the defendant. If the plaintiff was employed at the time of the alleged WPA violation, the plaintiffs case may proceed. If the plaintiff was not employed at the time of the alleged WPA violation, or was a job applicant or prospective employee at the time of the alleged WPA violation, the plaintiffs case must fail.[26] The plaintiffs classification while he was employed — i.e., as a contract, at-will, or just-cause employee — is irrelevant to the court’s determination. The court’s focus must be on whether the plaintiff, regardless of his classification, was employed by the defendant at the time the alleged WPA violation occurred.
*325 b. application
The charter of the city of Burton provides that:
[t]he Mayor shall appoint all administrative officers of the city, except the City Attorney and City Auditor. The Mayor’s appointments shall be subject to approval by an affirmative vote of four or more members of the Council. The Council shall act within thirty (30) days from the date of submission upon any appointments submitted by the Mayor for approval. [Burton Charter § 4.5(g), available at <http://www.mml.org/resources/information/charter/pdF 68.pdf> (accessed June 30, 2015) [http://perma.cc/ U654-49A8].]
The chief of police is among the city’s administrative officers. Burton Charter § 6.1(a). Most administrative officers, including the chief of police,
shall be appointed by the Mayor subject to the approval of the Council, and shall serve at the pleasure of the Mayor for indefinte [sic] terms, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same. [Burton Charter § 6.2(b).]
Accordingly, for the chief of police to continue his employment after a mayoral election, he must be reappointed or reaffirmed to the position by the mayor, within 30 days of the mayor’s election. This reappointment mechanism effectively means that a chief of police serves a four-year term, albeit “at the pleasure of the Mayor.”[27]
Here, Whitman alleges that he engaged in protected activity under the WPA — his purported whistleblowing regarding the city’s initial refusal to compensate him for unused sick leave — during the course of his four- *326 year appointment as police chief. He says that the mayor retaliated against him for this whistleblowing, in violation of the WPA, when the mayor declined to reappoint him as police chief after the mayor’s reelection in November 2007.
Under the express holding of Wurtz, Whitman may not bring a claim under the WPA.[28] Like Wurtz, Whitman alleges that defendants violated the WPA after the conclusion of his employment — i.e., after the conclusion of his four-year appointment as police chief.[29] He does not claim that he was “subject to a specific adverse employment action enumerated by the WPA” during the course of his employment.[30] As a candidate for reappointment to the office of police chief, Whitman was essentially a job applicant. His suit is premised on an alleged WPA violation committed by defendants after the termination of his four-year term as police chief.
Accordingly, Whitman, as a political appointee seeking reappointment, was not subject to the protections of the WPA at the time of the alleged WPA violation. Thus, his suit under the WPA has no merit. We therefore reverse the trial court’s denial of defendants’ request for JNOV.
2. PLAINTIFF DID NOT OB JECTIVELY ADVANCE THE PUBLIC INTEREST
Whitman is not entitled to protection under the WPA for an additional reason: his conduct, as an *327 objective matter, did not advance the public interest.[31] Because the WPA protects those who protect the public interest by blowing the whistle on illegality, and because laws in general are an expression of public policy for the benefit of the public, there is typically no question that reporting a violation of law advances the public interest. But this is not always true, and is certainly not true here.
In this case, Whitman’s actions are unquestionably and objectively contrary to the public interest. That is, regardless of his personal motivation, Whitman’s whistleblowing effort sought enforcement of a law that harmed, not advanced, the public interest.
*328 The law in question, Burton Ordinance 68-25C, § 8(1) (“68-C”), is not a law that protects the public interest. Rather, it is an ordinance that reads much like a standard, garden-variety collective-bargaining provision for wages and benefits.[32] It is simply a recitation that sets forth the wages and benefits for administrative, nonunionized employees of the city of Burton. In many workplaces, an employee must use sick days or vacation days, or lose them. But under some collective-bargaining agreements and employment policies, employees may accumulate these days and then get paid for all days not used. This perk is generally found in collective-bargaining agreements for unionized employees. But here, this benefit — along with a statement of wages and matters like dental insurance — was codified in 68-C.
The waiver of the benefit contained in 68-C, which plaintiff characterizes as a violation of law, has its origins in a severe financial crisis that afflicted the city of Burton in the early 2000s.[33] During this time period, the city’s department heads — who obviously benefited from 68-C — voted as a group not only to take a wage freeze, but to forgo the perk of payment for accumulated leave time to avoid harmful layoffs and reduced services to the public.[34] In other words, the administrative team’s waiver of the perk contained in the ordinance was an illustration of shared sacrifice by the *329 nonunionized department heads to advance the public interest of the citizens of the city of Burton at the employees’ expense.
Only one department head objected to this public-spirited waiver of the perk — Whitman, then the chief of police.[35] He demanded his money as set forth in the ordinance,[36] which he received after the mayor acted on the advice of outside legal counsel. This is the “law” plaintiff (mis)uses to assert a claim under the WPA.
We say “misuses” advisedly because the WPA is designed to ferret out violations of law that injure the public, especially when applied to public-sector defendants.[37] If government officials, who are bound to serve the public, violate laws designed to protect the public from corruption, pollution, and the like, then employees who, at their own risk, blow the whistle on such illegality, necessarily serve the public interest. This is precisely why the WPA grants such employees protection from reprisal. The law in question here was not a law to protect the public, but rather was a simple listing of wages, benefits, and various perks. The very *330 public servants who benefited financially from the ordinance made a personal sacrifice and waived their right to a perk to save the public badly needed funds, and to prevent layoffs and reduced public services. Any action contrary to the waiver was contrary to the public interest. Again, the waiver of the perk set forth in the ordinance at issue advanced the public interest. Opposition to that waiver — on which Whitman bases his suit — objectively disserved the public interest.
Also, whistleblowing assumes that an employee risks retaliation for uncovering the public employer’s misconduct. Here, there simply was no misconduct or illegality. The only conduct of the city employees that implicated 68-C was the department heads’ decision to waive the benefit provided by the ordinance, and Whitman’s refusal to honor that waiver. This is an employee’s insistence, plain and simple, that he get his perk — not an uncovering of corruption or illegality. And this disagreement about the legal effects of the waiver was satisfied, in Whitman’s favor, after the city sought legal counsel. Accordingly, Whitman’s citation of the ordinance was not whistleblowing. It was simply a disagreement regarding the proper interpretation of the city of Burton’s labor laws. That is, there was a disagreement about whether the administrative team could waive the perk provided by 68-C, and whether Whitman was bound by the group’s waiver. It had nothing to do with whistleblowing whatsoever.
That is why this is not the usual case. Reporting a violation of law normally constitutes conduct in the public interest.[38] Here, to the contrary, Whitman’s *331 actions — as an objective matter — were undoubtedly against the public interest. And defendants did not actually violate any law as violations of law have been traditionally understood in whistleblowing lawsuits— i.e., revealing public corruption or malfeasance. Defendants simply refused (at first) to grant Whitman a monetary perk he demanded because all managerial employees had waived that perk. Whitman may or may not have been entitled to his perk, but he most certainly is not entitled to claim the protection of the WPA when his conduct objectively served his interest, but harmed the public’s.
Because he was not a whistleblower under the WPA, no juror could have legally found in favor of Whitman on his WPA retaliation claim. The trial court’s denial of defendants’ request for JNOV is accordingly reversed.
B. CAUSATION[39]
We also held in our 2011 opinion, Whitman I, that *332 Whitman’s alleged whistleblowing activity from late 2003 to early 2004 was not the legal cause of the mayor’s decision to not reappoint him as police chief in late 2007.[40] On closer examination of the facts pertinent to the causation issue, we are even more convinced that Whitman’s alleged whistleblowing activity lacks a causal link to the mayor’s decision. We so hold for several reasons.
1. TRUST, NOT WHISTLEBLOWING
As noted, in 2003, the mayor’s administrative team voted to voluntarily take a wage freeze and forgo the perk of accumulated sick days to save the taxpayers money, and to avoid layoffs and reduced services.[41] This *333 sacrifice spoke well of the mayor and his department heads. Whitman’s refusal to abide by the department heads’ agreement and subject himself to the same sacrifice raised issues of trust and caused the mayor to rightly be disappointed in Whitman. Indeed, Whitman’s “evidence” of a causal connection between his whistleblowing and the mayor’s decision many years later to not reappoint him, frames the issue in exactly this context.
A third party who attended Whitman’s June 2004 meeting with the mayor made handwritten notes of the discussion, which state: “Mayor = No Trust — 68-C (vacation) — lack of communication [,]”[42] And the may- or’s alleged December 2007 statement to other senior police officers that he and Whitman “got off on the wrong foot”[43] — a statement that, if made, occurred after the mayor decided not to reappoint Whitman[44]— supposedly emphasized Whitman’s 68-C complaints as an issue of trust, in that his failure to adhere to a voluntary agreement with his colleagues betrayed that trust. In sum, it appears the mayor viewed the 68-C issue not in the context of whistleblowing, or anger at Whitman’s supposed whistleblowing, but instead as an example of how Whitman was untrustworthy. As noted, this is not a case where a “violation of law” was even remotely an issue. And it is extremely unlikely that this “lack of trust” over Whitman’s failure to honor an agreement on this specific occasion had anything to do with his subsequent dismissal, for the numerous reasons discussed below.
*334 2. ALLEGED RETALIATION IS TEMPORALLY REMOTE FROM ALLEGED WHISTLEBLOWING
Whitman’s claim has a serious temporal problem: he alleges that he was not reappointed in late 2007 for events that took place in late 2003 and early 2004. Our courts have taken pains to stress that the length of time between an alleged whistleblowing and an adverse employment action is not dispositive on the issue of retaliation — when those two events are close in time (i.e., days, weeks, or a few months apart).[45] If whistle-blowing and retaliation that occur close in time may not be sufficient to find causation under the WPA, then whistleblowing and retaliation that occur far apart in time certainly weigh against finding causation. See Fuhr v Hazel Park Sch Dist, 710 F3d 668, 675-676 (CA 6, 2013) (holding that in the context of a Title VII retaliation claim, a two-year gap between a plaintiffs protected activity and the claimed retaliatory act “proves fatal to [the plaintiffs] assertion that there is a causal connection”).[46]
*335 Here, there is an enormous temporal gap between Whitman’s alleged whistleblowing and the supposed retaliation, which belies any causal connection between the two. As noted, Whitman’s demands to receive compensation under 68-C took place in 2003 and early 2004. The mayor declined to reappoint him as police chief in November 2007 — almost four years after the supposed whistleblowing. Of course, the mayor, as the top executive officer of the city of Burton, could have terminated Whitman at any time [47] He could have done so in March 2003, when Whitman first voiced opposition to the waiver of 68-C, or in early 2004, when he insisted on his compensation under the ordinance. In fact, the evidence demonstrates that the mayor was not concerned about Whitman’s 68-C demands at all, because he reappointed him as police chief in November 2003 — six months after Whitman’s initial complaint regarding 68-C. And again, Whitman’s term expired in November 2007, almost four years after those complaints.
It strains credulity to the breaking point to suggest, as Whitman does, that the mayor — who had the power to dismiss Whitman at any time, for any reason or no reason — was so upset with his alleged whistleblowing in late 2003 and early 2004 but allowed Whitman to continue as police chief for all of 2004, 2005, 2006, and into late 2007, and only then decided to “retaliate” against him. Indeed, when viewed in the context of the *336 typically close working relationship between a mayor and his chief of police, and the fact that the chief of police, as a member of the mayor’s executive team, serves at the pleasure of the mayor, Whitman’s allegations take leave of reality and enter the theatre of the absurd.
3. BREAKS IN WHITMAN’S SUPPOSED CAUSAL CHAIN
The long period of time between Whitman’s supposed whistleblowing and the mayor’s decision not to reappoint him involves another aspect that is fatal to his claim: there are numerous breaks in the causal chain. Whitman’s first complaints regarding the administrative team’s waiver of 68-C in March 2003 clearly did not cause the mayor to retaliate. Indeed, the mayor reappointed Whitman as the chief of police in November of that same year. Whitman’s further attempts to secure compensation in January 2004 were addressed by the mayor, who first sought the advice of city counsel, and later, outside labor counsel. The mayor complied with that legal advice by paying Whitman almost $7,000 in additional compensation. And Whitman’s 2004 dispute with the mayor ended amicably — he remained chief for more than three years following that meeting, and by his own admission, he never heard mention of the 68-C dispute from the mayor and never was retaliated against during that time period. These intervening events — all positive developments for Whitman — raise serious doubts that his 68-C whistleblowing was a “determining factor” or “caus[e] in fact” of the mayor’s decision to not reappoint him. Matras, 424 Mich at 682.
4. WHITMAN’S MISCONDUCT LED TO ADVERSE EMPLOYMENT ACTION
In any event, Whitman has provided no evidence to *337 refute the mayor’s stated and compelling reasons for not reappointing him — Whitman engaged in serious misconduct and misused his office. After his reelection in November 2007, the mayor reevaluated his entire administrative team pursuant to the mandates of Burton Charter § 6.2(b).[48] During this period, he was advised of Whitman’s serious misconduct in office by officers in Whitman’s department. Among other things, these included allegations that Whitman (1) meted out inadequate discipline of subordinates who abused their power, (2) misused a city computer to exchange sexually explicit e-mail messages with a woman who was not his wife, (3) discriminated against a female officer, and (4) forged a signature on a budget memo.[49] Command officers within the police department warned the mayor of serious morale problems created by Whitman’s abuse of power.[50] In the face of these troubling revelations, the mayor understandably did not reappoint Whitman to this important position of public trust, and these are the reasons the mayor gave for declining to reappoint him as police chief in November 2007. To suggest that a mayor, whose chief of police works at the mayor’s pleasure, would make a reappointment decision based on an old, stale issue instead of very recent, more disturbing revelations, is simply fanciful.
*338 Whitman made no specific effort before this Court to deny these allegations against him other than to state, self-servingly and without support, that they were “merely a pretext,” and to assert “that his personnel file demonstrate [d] that his performance as a police chief was good, that he had received numerous awards, and that there were never any disciplinary actions against him.” Whitman II, 493 Mich at 309-310. Whitman’s only proffered “evidence” of a causal connection between his supposed whistleblowing and the mayor’s decision to not reappoint him was the statement the mayor made in December 2007 — after the mayor had already made his decision, but before its public announcement — in which the mayor supposedly told senior police officers that he lacked trust in Whitman. The mayor cited as one example Whitman’s refusal to keep his word, and along with the entire administrative team, to waive his unused sick-day compensation under 68-C.
Whitman’s assertion must be weighed against the other factors in this case: (1) the mayor’s view of Whitman’s 68-C demands as a trust issue, not a retaliation issue, and certainly not whistleblowing, (2) the almost four-year interval between Whitman’s alleged whistleblowing and the purported retaliation, (3) the causal breaks in Whitman’s claim, and (4) the allegations of Whitman’s extensive misconduct. When Whitman’s assertion is weighed against these factors, the evidence is overwhelming that his so-called whistleblowing had no connection to the mayor’s decision to not reappoint him as the police chief. There is simply no way that a reasonable fact-finder, even when “view[ing] the evidence and all legitimate inferences ... in the light most favorable to the nonmoving party,” Genna, 286 Mich at 417, could find that retaliation was “one of the reasons which made a difference *339 in determining whether or not to [discharge] the plaintiff.” Matras, 424 Mich at 682 (emphasis added; alteration in original).
IV. REPLY TO THE DISSENT
The dissent’s analysis betrays a basic misunderstanding of the nature and function of executive appointments in governmental administration. Again, the mayor of the city of Burton is required by the city charter to “reaffirm or appoint. . . administrative officers” to the city administration “within thirty (30) days from his election.” Burton Charter § 6.2(b). The city council is then required to confirm or deny the appointments “within thirty (30) days from the date of submission . . . .” Burton Charter § 4.5(g). Because the mayor is elected every four years, he is required by the city charter to reaffirm or appoint the city’s administrative officers every four years. Within that four-year span, the mayor may dismiss an administrative officer at any time. Burton Charter § 6.2(b). As a result, an administrative officer in the city of Burton has no expectation of continued employment. An administrative officer knows that his term cannot last longer than four years, because after the mayor’s election or reelection, an administrative officer must be reaffirmed to his position. And an administrative officer also knows that his term may be much shorter than four years— indeed, it may be ended at any time — because an administrative officer serves “at the pleasure of the mayor.”
Here, as we have explained in our opinion, Wurtz mandates that Whitman’s suit be dismissed. The mayor was reelected in November 2007. Upon the mayor’s reelection, Whitman’s term as police chief, which began in 2003, effectively ended. The city char *340 ter required the mayor to reaffirm or appoint a police chief and to submit his suggestion to the city council for approval. Thus, at that stage, Whitman was merely a candidate for the position of police chief. Accordingly, Whitman cannot now use the WPA to sue the city for the mayor’s ultimate decision to not reappoint him as police chief, because the WPA does not protect job applicants or prospective employees. In other words, Whitman may not bring a WPA claim against the city of Burton for the mayor’s decision to not reappoint him to an office that, as a matter of law, he no longer held at the time.
The dissent attempts to escape this obvious outcome with irrelevant appeals to emotion (“[Whitman] was a full-time, 32V2-year employee with the city of Burton”), misstatements of fact (“Smiley removed [Whitman] ... on November 27, 2007”), and basic misinterpretations of key terms (“[Whitman] enjoyed an ‘indefinite’ term of employment [as chief of police]”).
The last of these is particularly egregious. The true, noncolloquial, definition of “indefinite” is “not definite” — i.e., “having no exact limits.” Merriam-Webster’s Collegiate Dictionary (2014). This is exactly the way in which the word is used in the city of Burton’s city charter:
All other administrative officers shall be appointed by the Mayor subject to the approval of the Council, and shall serve at the pleasure of the Mayor for indefinte [sic] terms, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same. [Burton Charter § 6.2(b) (emphasis added).]
Instead of using the correct dictionary definition of “indefinite” and adhering to the broader context of the *341 sentence in which the word is used in the city of Burton’s charter, the dissent interprets “indefinite” to mean “forever” — i.e., that Whitman had an expectation of continued employment for an unlimited period of time.
This interpretation is the exact opposite of what the word “indefinite” actually means in the context of the city charter. Again, an “indefinite” term of employment is one that is “not definite” — i.e., one that can end at any time — today, tomorrow, or any time before the conclusion of the four-year term. Accordingly, the city charter’s use of “indefinite” means that while a police chief may be employed for a full four-year term, he serves at the pleasure of the mayor and may be terminated at any time before the expiration of the four-year term. Therefore, Whitman had no basis for his expectation of continued employment. But most important to the application of Wurtz, the law of the city of Burton required Whitman to be reappointed (and approved by the city council) as the chief of police every four years, after the mayor’s reelection. Because the mayor chose not to reappoint Whitman as police chief after his term as police chief had expired, Whitman has no recourse under the WPA.
Finally, the dissent attempts to confuse matters by insinuating that we do not recognize that at-will employees are protected under the WPA. Of course we recognize the obvious proposition that an at-will employee, like any other employee, is protected under the WPA — for retaliatory actions taken against him when he is employed. Here, defendants never took retaliatory action against Whitman while he was employed as chief of police. Rather, the mayor chose to not reappoint Whitman after the mayor’s reelection in Novem *342 ber 2007, at which time Whitman became a candidate for the (then open) position of police chief.
V. CONCLUSION
We hold that Whitman’s claim must be dismissed for any one or a combination of the following reasons: (1) Wurtz requires its dismissal, (2) objectively, Whitman’s conduct did not advance the public interest, but instead ran contrary to the public interest, and (3) the mayor’s refusal to reappoint Whitman, a political appointee, to another four-year term as police chief, was a result of Whitman’s egregious misconduct, not the alleged whistleblowing activity that took place long before his four-year term as chief had ended.
Accordingly, because no reasonable fact-finder could legally find in favor of Whitman on his claim under the WPA, we reverse the trial court’s denial of defendants’ motion for JNOV and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.
O’CONNELL, P.J., concurred with SAAD, J.

 A summary of the facts relevant to this opinion can be found at Whitman v City of Burton, 293 Mich App 220, 222-228; 810 NW2d 71 (2011) (Whitman I), and at Whitman v City of Burton, 493 Mich 303, 306-311; 831 NW2d 223 (2013) (Whitman II).

 MCL 15.361 et seq.

 Whitman I, 293 Mich App 220.

 Shallal v Catholic Social Servs of Wayne Co, 455 Mich 604; 566 NW2d 571 (1997).

 Specifically, Whitman first voiced his opposition to modification of the city ordinance at issue by stating that “[m]y current life style revolves around these very things [i.e., the benefit of receiving payment for accumulated leave time] that have been negotiated for me . . . .” See Whitman I, 293 Mich App at 225.

 Id. at 232 n 1.

 Whitman II, 493 Mich at 306.

 Id. at 321.

 See Whitman v City of Burton (On Remand), 305 Mich App 16; 850 NW2d 621 (2014) (Whitman III).

 Wurtz v Beecher Metro Dist, 495 Mich 242; 848 NW2d 121 (2014).

 Id. at 253.

 Whitman v City of Burton, 497 Mich 896 (2014) (Whitman IV).

 Wurtz, 495 Mich at 253.

 Id. at 251.

 Id. at 253.

 Id. at 252 (“[A]s gleaned from the WPA’s express language, the statute only applies to individuals who currently have the status of an ‘employee.’ ”).

 Id. at 252. See also id. at 252 n 16:
We recognize that plaintiff was an employee at the time he engaged in protected activity. Significantly, however, plaintiff *323 makes no claim that his employment contract was in any way breached or that he was subject to a specific adverse employment action enumerated by the WPA during his contract term. Rather, plaintiff maintains that because he engaged in protected activity during his contract term, he has a right under the WPA to renewal of his contract.

 Id. at 253.

 Of course, as the Michigan Supreme Court stated, at-will employees — like any other kind of employee — are protected under the WPA against WPA violations allegedly committed by their employer during the course of their employment. See id. at 256-257. However, at-will employees — like any other kind of employee — are not protected under the WPA against WPA violations allegedly committed by their employer after they are no longer employed. See id. at 253.

 Id.

 Id. at 244-245.

 Id. at 246-247.

 Id. at 247.

 Id. at 258-259.

 Id.

 See id. at 253.

 Mayoral elections take place every four years. Burton Charter § 4.2(b).

 Wurtz, 495 Mich at 252.

 As discussed in note 19 of this opinion, we recognize that if the mayor had terminated Whitman for whistleblowing activity during the course of Whitman’s four-year term as police chief, Whitman’s WPA claim might be valid. The reason Whitman’s claim is not valid is because he alleges a WPA violation committed by defendants after the conclusion of his four-year term.

 Wurtz, 495 Mich at 252 n 16.

 The Michigan Supreme Court did not address this aspect of the WPA in its 2013 opinion, nor did it do so in its 2014 order. Our understanding of the Supreme Court’s statement that Whitman “engaged in conduct protected under the WPA,” Whitman II, 493 Mich at 320, is that this protection is predicated on a narrow reading of the WPA — namely, one that only analyzes the relevancy of a plaintiffs personal motivations for “blowing the whistle.” Our 2011 opinion, reversed by our Supreme Corut, only addressed this discrete aspect of the WPA.
Because we did not analyze the overarching issue in our 2011 opinion — that is, whether the WPA only protects conduct that objectively advances the public interest — the Supreme Court did not address that issue in its 2013 decision. Because the Supreme Corut instructed us in its 2013 remand to consider “all remaining issues on which [we] did not formally rule,” we discussed this aspect of the WPA in the opinion issued, and vacated, in 2014, and do so again here. Id. at 321.
In any event, our Court has noted the distinction between an employee’s personal motives in reporting legal violations and reporting that actually advanced the public interest. See Phinney v Perlmutter, 222 Mich App 513, 554; 564 NW2d 532 (1997) (“In addition, whether plaintiff sought personal gain in making her reports, rather than the public good, is legally irrelevant and need not be addressed except to note that the reporting of misconduct in an agency receiving public money is in the public interest”) (emphasis added). Phinney’s holding on an unrelated matter was abrogated by Garg, 472 Mich at 290. (Garg overruled Sumner v Goodyear Tire & Rubber Co, 427 Mich 505; 398 NW2d 368 (1986), on which Phinney relied for its analysis of the continuing violations doctrine.)

 See Burton Ordinance 68-25C, § 8(1) (“68-C”). As noted by the Supreme Court, “Burton’s ordinance numbering and policy regarding unused leave time have changed since the time of the trial of this case.” Whitman II, 493 Mich at 306 n 3. We agree with the Supreme Court: “[b]ecause those changes are not relevant to our analysis, this opinion refers to the ordinance numbering and language as it was introduced during trial.” Id.

 Whitman I, 293 Mich App at 224.

 See Whitman II, 493 Mich at 307.

 Id., at 307. It appears that Whitman attended the March 2003 meeting when the department heads decided to waive 68-C, but it is unclear whether Whitman voiced an opinion on the waiver at the meeting.

 Id.

 “The [WPA] encourages employees to assist in law enforcement. .. with an eye toward promoting public health and safety. The underlying purpose of the [WE4] is protection of the public. The [WPA] meets this objective by protecting the whistleblowing employee and by removing barriers that may interdict employee efforts to report violations or suspected violations of the law. Without employees who are willing to risk adverse employment consequences as a result of whistleblowing activities, the public would remain unaware of large-scale and potentially dangerous abuses.” Dolan v Continental Airlines I Continental Express, 454 Mich 373, 378-379; 563 NW2d 23 (1997) (quotation marks and citations omitted; emphasis added; alteration omitted).

 Our sister states’ jurisprudence interpreting their whistleblower statutes recognize the distinction between reported legal violations that affect the public interest (which are protected) and reported legal violations that affect solely private interests (which are not protected). Though *331 the following cases involve internal corporate disputes — as opposed to reported violations of municipal statutes — we think that the reasoning is equally relevant to this case, where the ordinance violated did not advance the public interest. See Garrity v Overland Sheepskin Co of Taos, 917 P2d 1382, 1387 (NM, 1996) (noting that “[w]hen an employee is discharged for whistleblowing, the employee must also demonstrate that his or her actions furthered the public interest rather than served primarily a private interest”); and Darrow v Integris Health, Inc, 176 P3d 1204, 1214 (Okla, 2008) (concluding that “to distinguish whistle-blowing claims that would support a viable common-law tort claim from those that would not, the public policy breached must truly impact public rather than the employer’s private or simply proprietary interests”). Cases from foreign jurisdictions are not binding, but can be persuasive authority. People v Campbell, 289 Mich App 533, 535; 798 NW2d 514 (2010).

 To prevail under the WPA, Whitman must “establish a causal connection between [the] protected conduct and the adverse employment decision by demonstrating that his employer took adverse employment action because of his protected activity.” Whitman II, 493 Mich at 320. In the absence of direct evidence of retaliation (which Whitman *332 does not present), he must show indirect evidence to demonstrate “that a causal link exists between the whistleblowing act and the employer’s adverse employment action.” Debano-Griffin v Lake Co, 493 Mich 167, 176; 828 NW2d 634 (2013). A plaintiffs presentation of indirect evidence is analyzed under “the burden-shifting framework set forth in McDonnell Douglas [Corp v Green, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973)].” Id. Applying this standard to retaliation claims, a plaintiff must show that his “protected activity under the WPAwas “one of the reasons which made a difference in determining whether or not to [discharge] the plaintiff.” Matras v Amoco Oil Co, 424 Mich 675, 682; 385 NW2d 586 (1986) (quotation marks and citations omitted; emphasis added; alteration in original). In other words, “[t]o establish causation, the plaintiff must show that his participation in [a protected activity] was a significant factor in the employer’s adverse employment action, not just that there was a causal link between the two.” Rymal v Baergen, 262 Mich App 274, 303; 686 NW2d 241 (2004) (quotation marks and citations omitted). Because Debano-Griffin uses the McDonnell Douglas framework, which was originally designed for employment discrimination claims, it is appropriate for the Court to use federal cases interpreting McDonnell Douglas as persuasive authority. See Radtke v Everett, 442 Mich 368, 382; 501 NW2d 155 (1993) (stating that Michigan courts may “turn to federal precedent for guidance in reaching [a] decision” about whether a plaintiff has established a valid discrimination claim).

 Whitman I, 293 Mich App at 232 n 1.

 Id. at 230.

 Whitman II, 493 Mich at 309 (quotation marks omitted; alteration in original).

 Id.

 It is difficult to see how a statement the mayor allegedly made after he had already declined to reappoint Whitman could influence his decision not to reappoint Whitman.

 See, for example, West v Gen Motors Corp, 469 Mich 177, 186; 665 NW2d 468 (2003) (holding that to satisfy the causation requirement under the WPA, a plaintiff “must show something more than merely a coincidence in time between protected activity and adverse employment action”); Tuttle v Metro Gov’t of Nashville, 474: F3d 307, 321 (CA 6, 2007) (stating that “[t]he law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim”); and Shaw v City of Ecorse, 283 Mich App 1, 15; 770 NW2d 31 (2009) (noting that “[a] temporal connection between protected activity and an adverse employment action does not, in and of itself, establish a causal connection”).

 In its opinion, the United States Court of Appeals for the Sixth Circuit noted that “[o]ur review of the law shows that multiyear gaps between the protected conduct and the first retaliatory act have been insufficient to establish the requisite causal connection.” Fuhr, 710 F3d at 676. This observation is correct; courts interpreting our sister states’ whistleblower laws and jurisprudence have made similar observations. A long time span between the alleged whistleblowing and supposed retali *335 ation weighs against finding causation. See Blake v United American Ins Co, 37 F Supp 2d 997, 1002 (SD Ohio, 1998) (holding that alleged whistleblowing action that took place five years before plaintiffs termination was not “close enough in time ... to support a claim of retaliation”); Anderson v Meyer Broadcasting Co, 630 NW2d 46, 55 (ND, 2001) (holding that a “length/’ delay of approximately a year “between [plaintiffs] reports and her termination does not support an inference she was fired because of the protected activit/’).

 Again, Burton Charter § 6.2(b) states that the chief of police serves “at the pleasure of the mayor.”

 Again, Burton Charter § 6.2(b) states:
All other administrative officers shall be appointed by the Mayor subject to the approval of the Council, and shall serve at the pleasure of the Mayor for indefinte [sic] terms, except that the Mayor shall reaffirm or appoint those administrative officers and other appointive officers provided in this charter within thirty (30) days from his election, and give Council notice of same.

 See Whitman II, 493 Mich at 309; Whitman I, 293 Mich App at 227. Whitman admitted at trial that he used a city computer to exchange sexually explicit messages with a woman who was not his wife.

 Whitman I, 293 Mich App at 227.